### SUTHERLAND v. ILLINOIS CENT. R. CO.*

(Circuit Court of Appeals, Eighth Circuit. March 25, 1907.)

No. 2,316.

PRINCIPAL AND AGENT—ACTS OF AGENT—RATIFICATION—CARRIERS—CLEANING AND DRYING OF GRAIN BY CARRIER—RATIFICATION BY SHIPPER.

Plaintiff contracted for the sale of a large quantity of corn to be delivered in elevator at New Orleans for export and to grade No. 3 or better. The shipments were made in car load lots over defendant's railroad during about three months. At about the time they commenced plaintiff wrote his factors in New Orleans that he would ship over defendant's road because of its facilities for drying such of the corn as needed it. Certain of the cars when inspected in New Orleans failed to grade No. 3, and such cars were unloaded by defendant at another elevator, where the corn was cleaned and dried and then delivered on the contract; the result of such cleaning and drying being to reduce the weight. The charges of defendant for such service were paid by the consignees, and such charges, together with deductions for the shortage in weight, were shown by statements rendered from time to time by the consignees to plaintiff, and were allowed and paid by him without objection. Held, that such course of business amounted to a ratification by plaintiff of the acts of defendant in so treating the corn, even if not authorized in advance, and that, having availed himself of the benefits of such acts in obtaining a higher grade, he could not recover from it the charges and shortage on the ground that such treatment was not authorized by him.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Principal and Agent, §§ 644–655.]

In Error to the Circuit Court of the United States for the Eastern District of Missouri.

William H. Clopton, for plaintiff in error.

J. E. McKeighan and J. P. McBaine (Millard F. Watts and J. G. Drennan, on the brief), for defendant in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

HOOK, Circuit Judge. Sutherland, a grain dealer of St. Louis, sold between 1,100 and 1,200 car loads of corn to parties in New Orleans and shipped the same over the Illinois Central Railroad during a period commencing in December, 1903, and ending in the following March. The corn was consigned to shipper's order and the bills of lading contained directions to notify the New Orleans parties. As the shipments were made, Sutherland indorsed the bills of lading in blank, and attached them to sight drafts on the purchasers for ap-

*Rehearing denied June 11, 1907.

proximately the selling price of the corn. The drafts were at once forwarded for collection, and were paid by the purchasers before the arrival of the corn. The destination specified in the bills of lading was a certain elevator in New Orleans, where the corn was to be unloaded for export. All of the corn was sold to grade No. 3 or better and according to New Orleans weights and inspection; but it transpired that upon arrival and official inspection 250 car loads thereof were found to be inferior to the required grade. From time to time during the period mentioned, as the cars found to contain corn of inferior grade arrived in New Orleans, they were temporarily diverted by the railroad company, and sent to another elevator, where the corn was dried and in some instances cleaned, thus raising the grade to No. 3 or better, and making it deliverable under the contracts of sale. This being done, it was then sent to the designated destination. The drying and cleaning process resulted in a diminution of the weight of the corn so treated equivalent to nearly 12,000 bushels. The treatment charges, amounting to $1,371.88, were paid by the purchasers, and Sutherland reimbursed them from time to time as statements of the expenditures were furnished. Sutherland sued the railroad company for the loss in the weight of the corn and for the amount of the treatment charges, upon the ground that its action in diverting the corn and allowing it to be dried and cleaned before delivery at the destination specified in the bills of lading was a violation of its duty as a common carrier, was unauthorized by him, and could not have been lawfully authorized or ratified by the purchasers. The trial court directed a verdict for the railroad company. Hence this proceeding in error.

We need not stop to consider the contentions about the title to the corn, whether it remained in Sutherland or passed to the purchasers upon payment of the drafts and their receipt of the bills of lading, or even if Sutherland remained the owner, because the corn being of inferior grade was not deliverable under the contracts of sale, whether the railroad company, ignorant of the details of their contract relations, had a right to regard those who held the bills of lading either as the owners or as agents with sufficient authority to consent to the acts now complained of. Nor need we consider whether a rule that corn had to grade No. 3 or better to be admitted into export elevators at the port of New Orleans would be binding upon Sutherland, he not knowing of it.

There is another consideration that precludes a recovery. About the middle of December, 1903, Sutherland wrote his factors in New Orleans that the shipments in contemplation would have to be made over the railroad of the Illinois Central because of its facilities for drying such of the corn as needed it. Thereafter, when the corn commenced to go forward, he learned that part of it was running under grade and was being dried and cleaned to make it deliverable under his contracts. The certificates of official inspection of each car of inferior corn and of the weights before and after treatment were sent him within a few days after arrival and inspection in New Orleans. The purchasers paid the treatment charges, and their receipts for such payments were also forwarded to him. From these

certificates and receipts he knew the resulting diminution in weight and the precise amount of expense incurred and paid. He gave the purchasers credit for their disbursements and settled with them on the basis of the lesser weights; but he got his price for the corn as of the improved or higher grade. These instances were so many in number and were of such frequent occurrence that the method pursued assumed the character of a course of business; and Sutherland, fully advised of it, took all of the benefit it yielded without complaint of the corresponding loss. At no time during the progress of the shipments did he object to the action of the railroad company or to the propriety of the charges that were being incurred and paid. Whatever of advantage accrued from the improvement in the grade of the corn he accepted and said nothing; and now, after the business is at an end, he seeks to detach each shipment from the sequence of like occurrences, to have it considered as a transaction separate and apart from all of the others, and to recover for the loss in weight and the treatment charges because he did not consent thereto in advance. Clearly this will not do. It would be contrary to plain principles of justice and fair dealing. When Sutherland commenced shipping, he contemplated that some of the corn would need treatment. He knew that it was being done. He paid the charges without advising the railroad company of his objection and so induced it to continue. He received the benefit. It was his duty to speak if he was dissatisfied, and his silence was consent in a contractual sense.

The judgment is affirmed.